UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

NEIL GRENNING,

                             Plaintiff,

      v.

MAGGIE MILLER-STOUT, sued in
official capacity; and FRED FOX, sued
in official capacity,

                          Defendants.

NO:  2:09-CV-389-RMP

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

     This case was tried before the Court commencing on August 15, 2016.

Plaintiff Neil Grenning ("Grenning") was represented by Hunter Ferguson and Reid

McElrath of Stoel Rives, and Defendants Maggie Miller-Stout ("Miller-Stout") and

Fred Fox ("Fox") were represented by Jerry P. Scharosch and Timothy J. Feulner,

Washington State Attorney General's Office, their respective attorneys of record.

Grenning filed suit seeking the following relief: (1) a declaratory judgment that the

24-hour lighting used during his SMU confinement in January 2009 is cruel and

unusual punishment in violation of the Eighth Amendment; (2) a permanent

injunction barring Airway Heights Correctional Center ("AHCC") from subjecting

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 1

Grenning to 24-hour lighting with a brightness or intensity the same or similarly dangerous as that used in January 2009 in any future confinement in the SMU; and an order awarding reasonable attorney fees and costs.

Prior to trial, the parties stipulated to the following facts:

Grenning is a Washington State prisoner incarcerated at AHCC.  On January 7, 2009, Grenning was engaged in an altercation with another inmate, Michael Murray and following this incident, Grenning sought treatment in the AHCC medical unit.  After he received medical treatment, Grenning was confined in the AHCC Special Management Unit ("SMU") from January 7, 2009, through January 20, 2009.[1]

Grenning's medical records maintained by AHCC/Department of Corrections and produced in this case do not contain any record showing that Grenning visited the AHCC medical unit after his January 7, 2009, visit until June 1, 2010.  Other than the chart note on January 7, 2009, Grenning's medical records maintained by AHCC/Department of Corrections and produced in this case do not indicate that Grenning sought medical treatment in the AHCC medical unit for any alleged injuries between January 7, 2009, and January 20, 2009.

---

[1] Plaintiff represents that he has been sent to the SMU through no fault of his own, and Defendants presented testimony that inmates can be sent to SMU for a number of reasons, including in the interest of their own protection.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 2

Except for staff misconduct grievances, the Department of Corrections' Offender Grievance Program has four levels. The first level is the offender complaint level, or Level 0. At this stage the local grievance coordinator reviews the grievance and determines whether the grievance can become a formal grievance. The first formal level is Level I. At this level of review, the local grievance coordinator is the respondent for the grievance under DOC procedures. Grievances at Level 0 or Level I do not come before the Superintendent or his/her designee for review as a matter of course under DOC procedures.

If the inmate is not satisfied with the Level I response, he can appeal to Level II. At Level II, the respondent is the Superintendent or the Superintendent's designee. If the inmate is still not satisfied with the Level II response, he can appeal to Level III. At Level III, the respondent is the Deputy Secretary or the Deputy Secretary's designee.

Fifteen grievances were filed by other inmates related to the lighting between 2000 and 2009 and were produced in this case. Of those fifteen, the only three grievances that went to Level II or higher were Log ID Nos. 0010034 and 0122425, which went to Level III, and Log ID No. 0907705 which went to Level II. The other twelve grievances reached only Level I or the offender complaint level, including Log ID Nos. 0322009, 0526052, 0306314, 0120365, 0115929, 0508996, 0424317, 0603210, 0407882, 0107025, 0119532, and 0116896.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 3

**RELEVANT TRIAL TESTIMONY**

Defendant Miller-Stout testified that the SMU lighting is not intended to be punitive, but is instead meant to protect the safety and security of the inmates, the correctional officers, and the facility. Defendants presented testimony that in the SMU, correctional officers must check on high-risk inmates who are more likely to either violate prison rules or to be victims of other inmates and are at an increased risk of being suicidal. Despite these purposes and intentions, Plaintiff presented the testimony of three witnesses to argue that the 24-hour lighting in the SMU is still in violation of the Eighth Amendment's prohibition against "cruel and unusual punishment."

Plaintiff first called Tracy Rapp, a licensed engineer, to speak as an expert regarding lighting, and Defendants stipulated to his expertise. Rapp testified that on May 26, 2016, he conducted an investigation of a cell in the SMU at AHCC by taking pictures and taking light measurements in various portions of the cell. Rapp testified that the light fixture in the cell had three tube lights. The center bulb always remained on and the two side-bulbs could be controlled by an inmate with a switch inside the SMU cell. In relevant part, Rapp testified that his reading at the head of the bed reflected 7.1 foot candles when only the 24-hour, center light was illuminated, and an average of 5.9 foot candles in the rest of the room. In testifying about his readings, Rapp did not include precise measurements regarding the distance of his light meter from the light fixture.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 4

Rapp discussed additional measurements that he had taken for demonstrative purposes, such as the light measurements from underneath a parking-lot light (3.4 foot candles); on the back seat of a sport-utility vehicle with the dome light on (1.4 foot candles); a television set in a dark room, etc. Rapp also referred to lighting standards from various organizations and safety codes. Rapp acknowledged that there is no standard for lighting in SMU cells, but he analogized the setting to construction sites or public streets "where loitering or criminal attacks are likely to occur." Rapp also referenced standards for egress lighting. However, Rapp failed to adequately explain why these settings were helpful for determining proper lighting within a prison setting, or how standards for egress lighting would be applicable to an SMU cell.

Rapp's testimony was later challenged by Defendants' expert witness, Keith Lane, a professional electrical engineer and expert in lighting design, who testified that not only is egress lighting unhelpful for an analysis of proper lighting in a prison setting, but that Rapp's testimony also focused on the wrong measurements. Although the parties stipulated to Rapp's expertise to enable him to testify about lighting issues, his expertise was in general electrical engineering. Lane's expertise was specifically focused on lighting.

Rapp testified about averages but, as Lane pointed out during his testimony, Rapp failed to mention any analysis of maximum-to-minimum ratios, which account for the full range of foot-candle measurements in a room under various light settings.

As Lane explained, maximum-to-minimum ratios take into account the effects of fixtures in a room which can cause shadows or otherwise block visibility, important issues in the SMU where guards are looking through a window in the door to observe what is occurring in the cell.

Importantly, Rapp's testimony was void of any recognition of the purpose served by the SMU and how lighting must be used by correctional officers. He testified as to what he thinks would be sufficient lighting "necessary to perform a certain visual task" but without any knowledge of what "visual tasks" must be performed in the SMU. Rapp failed to recognize the objectives of correctional officers who depend on lighting in the SMU, and Rapp could not reliably testify about what level of lighting would be necessary to identify blood, injuries to an inmate, or the presence of contraband. Rapp's understanding of what activities could occur in a SMU cell was minimal as he referenced: "sleeping," "laying in a cot," and "moving around," but did not recognize the possibility of suicides or assaults on passing guards that occur within the SMU. Lane's testimony differentiated the lighting codes and standards that Rapp referenced, such as those that are applicable to egress lighting, with the level of lighting needed to observe activities in a cell.

The Court finds that Lane's testimony was based on a broader understanding of lighting issues and of the specific lighting needs in the SMU.

Plaintiff's second witness was a Doctor of Osteopathic Medicine, Amy Aronsky, a purported expert of "sleep medicine and behavioral medicine." Defendants stipulated to her expertise, but the Court finds that her testimony went beyond the scope of this stipulated expertise. Doctor Aronsky reviewed Plaintiff's medical file, but never examined him personally, and concluded that the cause of his alleged sleep deprivation and headaches was the lighting in the SMU. Dr. Aronsky testified that placing him back in the SMU with 24-hour lighting "would certainly recreate his migraine headache symptoms." Dr. Aronsky asserted that she could make this prospective conclusion "beyond a shadow of a doubt."

The Court affords minimal weight to Dr. Aronsky's testimony and to her conclusions and assertions for a number of reasons. First, Dr. Aronsky applied the standard of "beyond a shadow of a doubt" when expressing her prospective medical diagnosis regarding causation, which the Court finds of questionable validity considering the number of variables that she did not consider. Dr. Aronsky never examined Plaintiff, never spoke with him, and was completely unaware of his recent injuries or the nature of his convictions for sexual crimes against children that would make him a likely target for violence in prison and could result in increased anxiety, both for his own safety and possibly remorse, and that could be contributing factors of his insomnia. Furthermore, Dr. Aronsky testified that neither a decrease in lighting nor the use of sleep masks would change her conclusion that Grenning

would suffer from headaches if returned to the SMU with any level of 24-hour lighting.

Dr. Aronsky based her conclusions largely on Plaintiff's self-reported symptoms as she found them to be "classic" for sleep deprivation. Dr. Aronsky testified that "any light exposure, even at the lowest levels, will result in sleep deprivation." Accordingly, her testimony conflicts with the relief that Plaintiff requests as he seeks an injunction that does not eliminate all lighting, but simply requires Defendants to dim the 24-hour light in SMU cells. If the Court were to give credence to Dr. Aronsky's conclusions, which she bases on vague references to "medical literature," and "good old-fashioned common sense," Plaintiff would still be left without any remedy as neither party has suggested that the lights of the SMU should be completely shut off.

Dr. Aronsky failed to address the fact that Plaintiff's symptoms, such as headaches and insomnia, which she attributed solely to sleep deprivation, had occurred for most of his life in other settings. Grenning testified that he experienced headaches since middle school and while meeting with his attorney the day before this trial.

Dr. Aronsky testified that the 24-hour lighting caused Grenning's medical symptoms, and on cross-examination, Dr. Aronsky stated that any dimming of the lights would not affect her opinion. Recognizing that she never spoke with Plaintiff, Dr. Aronsky admitted to being ignorant of major stressors in Plaintiff's life, such as

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 8

the nature of his criminal acts, his work on a graveyard shift, Plaintiff's description of the SMU as often being loud, or the fact that Plaintiff had been head-butted in the face by another inmate just prior to complaining of headaches in the SMU.

Despite lacking all of this information, and without meeting Grenning personally, Dr. Aronsky testified that she had considered everything that she felt was necessary to conclude that his headaches were caused by the lighting in SMU and that nothing could make her doubt her conclusions. When asked on cross-examination whether any of the information that she had not considered would affect her determinations, Dr. Aronsky stated that not one of those considerations would cause her to doubt her conclusions.

The Court does not afford Dr. Aronsky's testimony significant weight because of her limited investigation into Grenning's history and circumstances, her disregard of other potential factors relating to his headaches, as well as her questionable expertise in light-related sleep disorders.[2]

Plaintiff, Neil Grenning, asserts that the 24-hour light within the SMU violated the Eighth Amendment's prohibition on "cruel and unusual punishment" because it caused him to be sleep-deprived and to suffer from migraine headaches.

---

[2] Dr. Aronsky testified that two of her more recent publications related to correct "coding" for billing purposes in sleep medicine. This fact does not strengthen the Court's confidence in her testimony in this case.

However, his testimony undercut the causal link between the SMU lighting and his alleged symptoms. Plaintiff testified extensively that he has suffered from the same types of headaches that he had in the SMU since he was a student in middle-school in the early 1990s; that he experiences the headaches once or twice a month, presumably even when housed outside of the SMU; that he suffers from sensitivity to light outside of the SMU; and that he most recently suffered a "light-related headache" on the day before trial while meeting with his attorney. Plaintiff presented records and testimony of the numerous times that he was seen by medical providers while incarcerated; that he received glasses for his condition, which he did not utilize in the SMU; and that he was repeatedly prescribed ibuprofen for his symptoms.

Grenning acknowledged that AHCC has implemented at least two changes in the SMU that are relevant to his claims: first, AHCC installed lower intensity lights in the SMU; and second, eye masks are available to all inmates for $1.24 per mask. If an inmate does not have funds on hand, the inmate may purchase a mask on credit. Although Grenning has not tried using a sleep mask in the SMU setting, he testified that he has a sleep mask and that light somehow "seep[s] around" the mask and that some light continues to penetrate through it, interrupting sleep. Plaintiff also did not address how the lower intensity lights that were installed by August 2013 would affect his symptoms.

The Court finds that Plaintiff's testimony undermined the causation of his symptoms as being due to the 24-hour light in the SMU because of his long history with the headaches and his headaches occurring outside of the SMU. Additionally, Plaintiff failed to provide evidence to question whether the installation of lower intensity lights and the availability of sleep masks are sufficient to reduce the harm that he has alleged, thereby rendering his claim for injunctive relief moot.

## ANALYSIS

In order for Plaintiff to prove his Eighth Amendment claim, he must demonstrate that Defendants deprived him of a "minimal civilized measure of life's necessities," *see Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (quoting *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991))), and that Defendants acted with "deliberate indifference" in doing so, *see Farmer v. Brennan*, 511 U.S. 825 (1994). The Ninth Circuit has directed this Court to apply the "deliberate indifference" standard, although "[t]he existence of a legitimate penological justification has [] been used in considering whether adverse treatment is sufficiently gratuitous to constitute punishment for Eighth Amendment purposes." *Grenning v. Miller-Stout*, 739 F.3d 1235, 1240 (9th Cir. 2014).

Defendants analogize this case to the facts of *Chappell v. Mandeville*, 706 F.3d 1052, 1058 (9th Cir. 2013), in which a prisoner was subjected to continuous light for seven days. The Ninth Circuit in *Chappell* made reference to a number of

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 11

other courts that had investigated the existence of an Eighth Amendment violation for continuous lighting, and although the results were mixed and fact-specific, "[a] large majority of the courts [] concluded that there was no Eighth Amendment violation." 706 F.3d at 1059. Although the Ninth Circuit did not determine whether a violation had occurred because Defendants in that case were entitled to qualified immunity, the court stated that it had "some doubt that the conditions that Chappell experienced . . . amounted to an Eighth Amendment violation." *Id*.

On the other hand, in *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996), the Ninth Circuit held that when an inmate alleged physical and psychological harms due to continuous light for a period of six months, he had alleged enough to survive summary judgment regarding whether he had been deprived of the "minimal civilized measure of life's necessities."

At the summary judgment stage in this litigation, the district court approved the magistrate judge's determination that in order for Plaintiff to be entitled to injunctive relief, he must demonstrate that (1) he suffered an irreparable injury; (2) the remedies available at law are inadequate to compensate for the injury, (3) the balance of hardships between the parties warrants a remedy in equity, and (4) the public interest is not disserved by a permanent injunction. *See eBay v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); ECF No. 136 at 13.

/ / /

/ / /

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 12

### (1) Whether the lighting caused Grenning any injury

Plaintiff's claim is premised on his assertion that the 24-hour lighting in the SMU caused what he believed to be light-related headaches and sleep deprivation. Plaintiff has the burden of proving causation by a preponderance of the evidence. However, Plaintiff has failed to produce evidence beyond his own subjective conclusions and Dr. Aronsky's conclusory statements regarding the connection between the 24-hour lighting and his symptoms.

Plaintiff's testimony also undermines the causation element because he testified that he suffers from the same symptoms that he allegedly experienced in the SMU in different settings and has suffered with these same issues for a majority of his life, before he ever was incarcerated and long before he was sent to the SMU. Furthermore, Plaintiff testified that the most recent time that he suffered a headache so severe that it caused him to vomit was while he was meeting with his attorney on the day before trial began in this matter, outside of the SMU and not subject to 24-hour lighting.  Plaintiff failed to address other possible causes of his symptoms, including the fact that he was head-butted, punched, and thrown by another inmate just prior to being sent to the SMU; the anxiety he admitted to experiencing in prison; the noise in the SMU; and other health issues like nausea, heartburn, and aches.

The only evidence presented at trial, besides Grenning's own conclusions, supporting the proposition that the 24-hour lighting in the SMU caused Plaintiff's

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 13

purported symptoms came in the form of Dr. Aronsky's conclusory testimony.  As stated previously, the Court finds this testimony to be of little weight.  Dr. Aronsky conceded that she had never met Plaintiff; never examined him; was unaware of a number of important variables, including the circumstances of the inmate assault on Plaintiff; and had never visited the SMU cell to see the lighting that she deemed to be the cause of his medical issues.  Dr. Aronsky testified that in her opinion, any light would cause sleep deprivation which would cause his headaches.

Based on the foregoing, the Court finds that Plaintiff has failed to demonstrate that the lighting within the SMU caused him any injury.

**(2) Whether the lighting levels in the SMU created an excessive risk of serious harm to Grenning sufficient to offend contemporary standards of decency**

The parties do not dispute that lighting is necessary within the SMU to enable welfare-checks by the correctional officers, but the parties dispute whether the current brightness of the 24-hour lighting is necessary or creates an excessive risk of harm.  Plaintiff argues that something dimmer is sufficient, but did not provide credible evidence regarding any specific remedy or benchmark by which the Court could determine whether the current brightness is excessive.

Tracy Rapp referred to a measure of one foot-candle being bright enough for a welfare-check, but his testimony was disconnected from what correctional officers need in the SMU.  Plaintiff failed to provide any measure of what would be sufficient lighting to allow officers looking through a window in the cell door to

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 14

view blood, injuries, or contraband, and the Court has no evidence from which it could conclude that a lower level of lighting would adequately serve these purposes.

Rapp suggested alternatives to the 24-hour light, such as installing a switch that would allow both the inmates and correctional officers to control the 24-hour light. This suggestion, however, did not address how a guard's switching a light on every thirty minutes during the night for welfare-checks would be any less disruptive to an inmate's sleep than a continuous light. Defendant Miller-Stout testified that switching lights on and off as the correctional officers moved down a cell-block also would telegraph their movement to the inmates, putting the officers at a higher risk of attack and allowing inmates to plan covert actions around the officers' movements.

Plaintiff's evidence can be divided into two groups: Dr. Aronsky's testimony that any light would cause sleep deprivation; and Tracy Rapp's testimony comparing the intensity of the 24-hour light to his light readings in various settings, such as the back seat of a car or a television screen in a dark room. None of the Plaintiff's evidence is persuasive that the current 24-hour light creates an excessive risk of serious harm to Grenning, nor that it offends contemporary standards of decency. Furthermore, considering Defendants' evidence that AHCC already has installed less intense lights and currently provides inmates access to sleep masks, the Court finds that any risk imposed by the lighting is further diminished.

The Court finds that neither Dr. Aronsky's inferred proposal of no lights at all nor Rapp's alternative suggestions of switching lights on and off or maintaining unrealistically low light levels is practical, considering the purpose of the lights and the realities of the SMU.  Plaintiff also did not submit evidence that any of his proffered alternatives would resolve his personal symptoms and the basis of his lawsuit.

**(3) Whether Defendants were deliberately indifferent to any risk posed by the lighting**

The parties split this factual inquiry into two sub-parts:

**(a) Whether Defendants were aware of any risk created by the lighting**

Plaintiff has the burden of proving by a preponderance of the evidence that the 24-hour lighting caused specific risks and that Defendants were aware of those risks. Plaintiff argued that there were fifteen complaints about lighting at AHCC, which Defendants argue comprised .06% of the total number of complaints during the relevant time period.  The parties submitted exhibits affirming that both Fred Fox and Maggie Miller-Stout were aware of complaints about the 24-hour lighting in the SMU and responded that the issues raised in the prisoner grievances did not require a change in lighting.  *See* Exhibits 53 and 224.

Fox dealt directly with Grenning's grievance, but the extent of Miller-Stout's knowledge regarding Grenning's complaint is unclear.  However, based on the evidence presented by Plaintiff, the Court finds that both Fred Fox and Maggie

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 16

1  Miller-Stout were aware of complaints from inmates regarding the 24-hour lighting.

2  As previously addressed, the Court finds that Plaintiff has failed to provide sufficient

3  evidence to prove by a preponderance that he suffered "any risk created by the

4  lighting." Therefore, the Court finds that Defendants were not aware of any risk to

5  Plaintiff created by the lighting.

6  **(b) Whether Defendants acted reasonably in light of any risk**

7  Defendant Fox testified that when he received Plaintiff's grievance about the

8  lighting, he spoke with his supervisor, who informed him that the American

9  Corrections Association (ACA) had reviewed the SMU and that the lighting was in

10  line with their requirements. Additionally, he testified that he had checked with the

11  facility's medical unit in an effort to find out more information about possible

12  medical issues and if the SMU would, in fact, be significantly detrimental to

13  Plaintiff. Fox testified that the medical department informed him that they had not

14  received any complaints from Grenning relating to the conditions in the SMU. The

15  Court finds that Fox's inquiries constituted a reasonable response to Plaintiff's

16  grievance.

17  Defendant Miller-Stout similarly testified that when she received

18  notification of a complaint regarding the lighting in the SMU, she relied on a prior

19  federal case that arose in this federal district, *Ridley v. Walters*, which held that the

20  lighting in the SMU at AHCC did not violate the United States Constitution.

21  Although the extent of Miller-Stout's knowledge regarding Grenning's complaint

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 17

remains unclear, Defense counsel provided a notice addressed to Miller-Stout

stating that Grenning's Level II grievance was denied by an Administrative

Program Manager due to the ruling of a federal court.  *See* Exhibit 227.  If the

Court reads Exhibit 227 as demonstrating Miller-Stout's response to Grenning's

grievance, the Court finds that Miller-Stout's reliance on previous case-law

allowing the same lighting at the same facility was reasonable.

### (4) Whether there is a sufficient likelihood of Grenning again being confined in the SMU under the same conditions that he faced in January 2009

Plaintiff testified that he has been placed in some sort of segregation about

twelve times, sometimes as a result of the actions of others.  Plaintiff was sentenced

to a term of 116 years imprisonment, making it substantially likely that he will be

placed in segregation again at some point in the future.

In the time since Plaintiff was placed in the SMU at AHCC in 2009,

Defendants have replaced the bulbs in the SMU with lower wattage bulbs and have

given inmates access to sleep masks to cover their eyes from the 24-hour light.

Although Plaintiff argues that these changes would be insufficient to address his

symptoms, the record is void of evidence to support that assertion.  Therefore, the

Court has insufficient evidence to find it likely that Grenning will be subject to the

same conditions that he experienced in the SMU in January of 2009.

Prior to trial, the parties proposed five "issues of law" to be determined by the

Court.  Considering the findings outlined above, the Court addresses each in turn.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 18

**(1) Whether exposure to the lighting in the SMU is sufficiently serious to violate the Eighth Amendment**

The Ninth Circuit Court of Appeals has stated that "[t]here is no legitimate penological justification for requiring [inmates] to suffer physical and psychological harm by living in constant illumination.  This practice is unconstitutional."  *Keenan v. Hall*, 83 F.3d 1083, 1090-91 (9th Cir. 1996), *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998) (quoting *LeMaire v. Maass*, 745 F.Supp. 623, 636 (D.Or. 1990), *vacated on other grounds*, 12 F.3d 1444, 1458-59 (9th Cir. 1993)).  This case presents the question of whether prison officials violate the Eighth Amendment when they keep one of three lights illuminated at all times in an SMU cell for a period of thirteen days.

Plaintiff has presented no credible evidence that the continuous illumination of one of three lights caused his sleep deprivation or any of his headaches, disorientation, or other related symptoms.  Grenning failed to address any number of other causes for his symptoms, including the fact that he was head-butted prior to being sent to the SMU, that the injury had occurred when he was attacked in a prison bathroom, or if these symptoms were related to other medical issues about which he had complained in the past (*e.g.*, nausea, heartburn, aches, etc.).  Additionally, Grenning testified extensively that he has experienced the same or similar symptoms prior to being incarcerated, outside of the SMU context, and far from the constant illumination that is the subject of this suit.

Grenning's testimony demonstrated that the causal link between the lighting and his symptoms was, at best, tenuously related. Plaintiff has failed to provide any evidence supporting the assertion that the 24-hour low-level illumination disrupted Grenning's sleep or caused him any harm. Therefore, the Court finds that the conditions that Grenning endured for thirteen days in the SMU in 2009 did not deprive him of the "minimal civilized measure of life's necessities," and fall far short of a deprivation that would be sufficiently serious to violate the Eighth Amendment's prohibition on "cruel and unusual punishment."

Furthermore, the Court has significant evidence regarding the necessity of the 24-hour illumination in SMU cells. William Stockwell, a former supervisor in the Correctional Unit, testified that inmates are placed in the SMU when it is necessary for them to be viewed more closely by prison staff, whether that is due to their own improper behaviors, or due to their being targeted by others. In any circumstance, Stockwell testified that the inmates within the SMU are at a higher risk of attempting suicide; inflicting self-harm; having seizures; trying to stage attacks on passing guards; or hiding weapons, drugs, or other contraband. Defendant Miller-Stout also testified that the continuous lighting is maintained as a safety measure for the guards as well as inmates and is not imposed as any sort of punishment.

The testimony of both Stockwell and Miller-Stout demonstrate the legitimate penological purpose of the 24-hour lighting in the SMU and establish that the lighting is not, in fact, a "punishment" for purposes of an Eighth Amendment

analysis.  Indeed, Plaintiff does not oppose the obvious need for lighting to conduct welfare-checks; he only requests that the lighting be lowered without specifying what would be acceptable to address his alleged symptoms.[3]  The alternatives to 24-hour lighting offered by Plaintiff's witnesses, which included using a flashlight or switching lights on and off, were untethered to the realities of life in the SMU, such as the difficulty of using a flashlight to see an entire cell by flashing a light through the small window of the cell door or inadvertently telegraphing guard movements if the guards switched lights on and off or shown flashlights through the doors.

Considering that the lighting is tailored to clearly-defined safety purposes, that the lighting is not punitive and is not intended to be, that proposed alternatives likely would be insufficient to meet the needs of the prison staff and the safety needs of the inmates, and especially considering that the Plaintiff failed to prove causation of Grenning's symptoms, the Court finds that Grenning's complaints do not rise to a violation of the Eighth Amendment.

**(2) Whether Defendants acted with deliberate indifference toward Grenning's health or safety**

Although the Court has found that Plaintiff has failed to prove that his allegations are "sufficiently serious" to constitute an Eighth Amendment violation,

_____

[3] Although Rapp referenced 1 foot-candle as being sufficient to observe any activity in a cell, when asked if he had an opinion about the average amount of light that should be allowed in the SMU at night, he did not have an opinion.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 21

as an alternative analysis, the Court will assess whether Defendants displayed

deliberate indifference to Grenning's complaints.

> To find deliberate indifference, the Court engages in a two-part inquiry.

> First, the inmate must show that the prison officials were aware of a "substantial risk of serious harm" to an inmate's health or safety. *Farmer*, 511 U.S. at 837[]. This part of our inquiry may be satisfied if the inmate shows that the risk posed by the deprivation is obvious. *See id.* at 842[] ("[A] factfinder may conclude that a prison official knew of a substantial risk [to a prisoner's health] from the very fact that the risk was obvious."). Second, the inmate must show that the prison officials had no "reasonable" justification for the deprivation, in spite of that risk. *See id.* at 844[] ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably.").

*Thomas v. Ponder*, 611 F.3d 1144, 1150–51 (9th Cir. 2010).

The evidence at trial demonstrated that Miller-Stout had seen an earlier

grievance regarding lighting in the SMU, but she may not have been explicitly

aware of Grenning's complaint. Miller-Stout could not recall the specifics of her

response to a particular prisoner complaint from 2000 (Exhibit 53 at 5), but she

testified that she was aware of an earlier ruling by a federal court that found the

lighting in the SMU to be permissible. Although it is unclear whether Miller-Stout

was aware of Grenning's complaint, even if this was established definitively and if

Miller-Stout had responded exactly as she had to a prior complaint about lighting

in the SMU back in 2000 (Exhibit 53 at 5), she would have had a reasonable basis

to believe the lighting did not pose an undue risk to inmates because of the prior

ruling by the federal court.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 22

Defendant Fred Fox testified that he had dealt with Grenning's grievance directly as part of his duties as Classification Counselor.  When Fox received Grenning's complaint, he brought it to his Custody Unit Supervisor, James Dyson, who informed Fox that when the American Corrections Association (ACA) had conducted an audit, they "cleared segregation" and that AHCC was in compliance with the ACA regarding the lighting in the SMU.  Furthermore, Fox reached out to the AHCC medical department and checked if Grenning had contacted them about his alleged headaches or related symptoms that he attributed to the conditions in the SMU.  Fox testified that the medical department informed him that they had not received any such communications.

Even assuming that Grenning had a valid argument that he was being deprived of his rights, the only evidence before the Court is that in response to complaints about the lighting, Defendants reasonably relied on a federal court ruling and the approval of the ACA.  Furthermore, Fox went beyond that to learn from the AHCC that Grenning had not sought assistance for headaches beyond asking the circulating nurse for ibuprofen.[4]

---

[4] Grenning testified that a nurse would circulate through the SMU during his time there, and when he complained to nurses about his headaches, they provided him with ibuprofen.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 23

The Court finds that Defendants responded reasonably to Grenning's grievances especially when viewed in the context of their testimony regarding the thousands of grievances that Defendants had to address on topics ranging from the quality of the food to the timely transportation of property.  Accordingly, even if the Court had found that Grenning's complaints about the lighting were valid, he has failed to prove that Defendants acted with "deliberate indifference."

Additionally, the fact that prisoners are now provided with sleep masks, even if they cannot afford them, further demonstrates that Defendants took action to assuage the concerns of inmates like Grenning, and further weakens Grenning's claim of deliberate indifference.

**(3) Whether Grenning will suffer an irreparable injury absent an injunction**

Defendants asserted throughout this litigation that Grenning lacked standing to bring his claims regarding the lighting in the SMU.  In order to have Article III standing, a plaintiff must establish:

> (1) that the plaintiff ha[s] suffered an "injury in fact"— an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of— the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (2) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 24

*Friends of the E. Lake Sammamish Trail v. City of Sammamish*, 361 F. Supp. 2d

1260, 1268 (W.D. Wash. 2005) (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)

(citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992))).

As discussed previously, Grenning has not shown that the lights within the

SMU caused an injury-in-fact that could be redressed by an injunction.  Now that all

of the relevant evidence has been presented at trial, the Court finds that Plaintiff's

alleged injuries are not more likely than not attributable to 24-hour lighting.

Plaintiff testified that he still suffers from headaches similar to the ones that are at

the heart of this suit, including one only a day before trial when he was meeting with

counsel.  No injunction regarding SMU 24-hour lighting would have prevented that

headache.  Whether Plaintiff is in SMU or in the general population (and prior to

being incarcerated, out in his daily life), he apparently suffers from the same or

similar symptoms; therefore, an injunction would do nothing to remedy his alleged

injuries.

In addition, the conditions within the SMU at AHCC have been changed since

Grenning was placed there in 2009.  Grenning requests that the lights be dimmed in

the SMU, but the 24-hour lighting has been dimmed since 2009.  Grenning now

would have access to a sleep mask if he is ever placed in the SMU again.  Despite

Grenning's assertions that these changes are insufficient, the Court finds that

Plaintiff has failed to prove by a preponderance of the evidence that the conditions

as they existed in 2009 caused him harm or that he will suffer "irreparable harm"

currently or in the future when AHCC already has a dimmer light in the SMU and grants access to sleep masks.  The Court finds that Plaintiff has failed to prove that he will suffer an irreparable harm without an injunction.

### (4) Whether the balance of hardships between the parties absent an injunction weighs in Grenning's favor

As previously stated, the Court finds that Grenning has not proven any hardship caused by the 24-hour lighting beyond his subjective dissatisfaction.  Also, if Grenning is placed in the SMU absent an injunction, he will be subjected to dimmer 24-hour lighting than he experienced previously, and he can use a sleep mask to cover his eyes.  The Court finds his alleged remaining "hardships" to be minimal.

On the other hand, an injunction to dim the 24-hour lighting within the SMU would impose significant costs on Defendants.  With dimmer lights, officers would have more difficulty conducting "welfare-checks," to see and identify inmates' injuries, risks to officers or other inmates, and the presence of contraband.  If Defendants were forced to turn off the 24-hour lights and only switch them on during welfare-checks, Miller-Stout testified that inmates would be better able to predict guard movements and could plan illicit activities accordingly.  Additionally, Plaintiff has presented no evidence that the intermittent lighting would affect inmates' sleep any less than the current 24-hour bulb in a blue sleeve.

Plaintiff did not provide evidence of a level of brightness that would both satisfy Grenning while still allowing correctional officers to carry out their duties

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 26

and did not argue for the lights to be shut off entirely.  The Court finds that absent an

injunction, Grenning will not be subjected to any undue harm, but an injunction

would impose significant hardship on Defendants.  Therefore, the Court finds that

the balance of hardships weighs against entering an injunction.

### (5) Whether the public interest will be disserved by an injunction

Although there is a strong public interest in maintaining prisons that adhere to

Constitutional standards, Plaintiff has failed to demonstrate how either the

conditions in the SMU in 2009 or the current conditions fail to do so.[5]  There also is

a strong public interest in maintaining safe prisons where correctional officers are

able to carry out their duties by checking on inmates and seeing if they are in danger.

An injunction in this case would make Defendants' duties more difficult without

providing any demonstrable benefit to Grenning or the public.

### CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the Court

finds that Grenning has not met his burden of establishing a violation of his rights

under the Eighth Amendment of the United States Constitution.  Defendants

---

[5] Defendants also reference the additional statutory requirements of 18 U.S.C. §
3626 for an injunction regarding prison conditions.  In light of the Court's
determination that Plaintiff failed to provide any basis to impose an injunction, the
Court need not address these heightened requirements.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 27

previously moved for Judgment on Partial Findings Under Rule 52(c), ECF No. 177. In light of the fact that the Court heard all of the evidence presented in this case from both parties and has made a fully-informed decision in favor of Defendants, the Rule 52(c) motion is denied as moot.

Accordingly, **IT IS HEREBY ORDERED**:

1. Judgment shall be entered in favor of all Defendants.

2. Defendants' Motion for Judgment on Partial Findings Under Rule 52(c), **ECF No. 177**, is **DENIED AS MOOT**.

3. All other pending motions, if any, are **DENIED AS MOOT**.

The District Court Clerk is directed to enter this Order, provide copies to counsel, **enter Judgment in favor of Defendants** and **close this case**.

**DATED** this 5th day of October 2016.


_____*s/ Rosanna Malouf Peterson*_____
ROSANNA MALOUF PETERSON
United States District Judge